ORIGINAL

FILED
JUL 3 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GLOBE AVIATION SERVICES CORPORATION, GLOBE AIRPORT SECURITY SERVICES, INC. AND GLOBE AVIATION SERVICES CORPORATION OF PUERTO RICO,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

Case No. 07-500 C

**COMPLAINT**

Plaintiffs, Globe Aviation Services Corporation, Globe Airport Security Services, Inc. and Globe Aviation Services Corporation of Puerto Rico (hereinafter, unless otherwise indicated, collectively "Globe" or the "Company"), by its undersigned counsel, Venable LLP, for its complaint against Defendant, allege upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1. This action arises out of the federal government's passage and implementation of legislation, Section 101 of the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (the "Act") (codified primarily in sections of Title 49 of the United States Code), that federalized all passenger and baggage screening functions ("security screening business") at commercial airports in the United States and Puerto Rico, thereby displacing Globe, and all other private airport security companies, which had provided such services to air carriers in the United

States and Puerto Rico for the last several decades.[1] As set forth herein, Globe alleges that the federal government has, through the actions of the Transportation Security Administration ("TSA"): (i) failed to provide "adequate compensation" to Globe for the loss of its airport security contracts, as the government was required to do pursuant to the Aviation and Transportation Security Act; and (ii) taken Globe's airport security screening business, and essentially destroyed the Company's going-concern value and goodwill, for public use and without just compensation, in violation of the Fifth Amendment of the United States Constitution.

2. For nearly twenty (20) years, Globe had been a leader in the United States' airport security industry. Over the years, Globe secured contracts with a number of major commercial airlines to provide airport security services at over fifty (50) airports in over fourteen (14) states. Globe maintained long-term contractual relationships with most of these air carriers, which typically renewed their agreements automatically at the end of the contract's term. As a result, some of these contractual relationships had been in existence for over fifteen (15) years.

3. In the years leading up to September 11, 2001, the demand for airport security services in this country had steadily increased. To meet this increase in demand, the commercial airlines, charged by statute/regulation with providing airport pre-board screening work for their flights, contracted with private security companies such as Globe to furnish these necessary services.

4. In the immediate aftermath of the attacks of September 11th, the number of security personnel performing airport screening services substantially increased, due in large part to more extensive airport screening security requirements mandated by TSA and other government agencies.

---

[1] The Act provided exceptions for charter air carrier and minor gate screening operations for select international air carriers. These exceptions represent less than 1% of all domestic passenger screening operations.

5. In November 2001, the federal government enacted the Aviation and Transportation Security Act . The Act required, among other things, that a newly-created federal agency – TSA – begin screening all passengers and baggage at all commercial airports in the United States and Puerto Rico using government personnel by November 19, 2002. As a result of the Act and the creation of and actions taken by TSA, the value of Globe's security screening business was essentially eliminated because Globe was then excluded from performing such services at airports in the United States and Puerto Rico.

6. To carry out the mandates of the Act, the TSA hired thousands of individuals to form a new federal workforce of security screeners. Many of these persons had been Globe employees at the time of the Act's passage, but shifted to federal employment to preserve their jobs as a result of the federalization of their function. These federal screeners were gradually deployed by the TSA during 2002 to airports across the country and in Puerto Rico, thereby displacing Globe's employees and screening operations on a site-by-site basis.

7. As a direct result of the Act and the actions of the TSA, the going-concern value and goodwill of Globe's airport security screening business has been entirely eliminated – a taking for which Globe is entitled to just compensation. The Company has been deprived of the value of nearly its entire workforce of highly-trained screeners, many of whom were hired by the federal government and some of whom became unemployed. The government assumed control of United States and Puerto Rico airport screening work, physically taking over Globe's screening operations at all terminal checkpoints where it previously had operated under contracts with the airlines.

8. The government's decision to federalize aviation security and the actions of the TSA have resulted in a complete takeover of Globe's airport security screening business. With the

exception of an extremely limited pilot program, from which Globe has been excluded, the Act has prohibited Globe from providing airport security checkpoint screening services at any commercial airport in the United States and Puerto Rico for more than four years. This prohibition will likely continue for the foreseeable future. Today, the TSA carries out the pre-board passenger and baggage screening functions that were previously provided by Globe. What once belonged to Globe – the goodwill and going-concern value of Globe's airport security screening business – the government has taken for itself. While the federal government had the legal authority to do so, it is obligated under the Act to pay Globe "adequate compensation" for the loss of its contracts with the air carriers.

9. To meet its statutory obligations to assume civil aviation security functions within three (3) months of the enactment of the Act, TSA required the private security companies that were performing airport screening functions to enter into interim contracts with the government at each separate airport and site where it was conducting screening services. These contracts remained in effect for up to a nine-month transition period while the TSA gradually took control of all airport screening functions on a site-by-site basis. At the termination of each interim contract, TSA substituted a federal workforce for the private security screeners and thereby completely assumed Globe's contracts and security screening business. On information and belief, other airport screening operations experienced the same federalization and gradual replacement at the airports sites as Globe.

10. Even though the government has repeatedly admitted that it assumed Globe's security screening for the airlines, and thereby appropriated Globe's contracts and airport security screening business, TSA has not provided Globe with adequate compensation, in direct violation of the express provision of the Act.

11. In addition, under the Fifth Amendment of the United States Constitution, the government must provide Globe with "just compensation" for the loss of its business. It is unconstitutional and unfair to force Globe to bear this burden, which should more appropriately be shouldered by the public as a whole.

**THE PARTIES**

12. Plaintiff, Globe Aviation Services Corporation, is a corporation organized under the laws of the State of Delaware, with its principal place of business in Springfield, Virginia. Plaintiff, Globe Airport Security Services, Inc., a wholly-owned subsidiary of Globe Aviation Services Corporation, is a corporation organized under the laws of the State of Delaware, with its principal place of business in Springfield, Virginia. Plaintiff, Globe Aviation Services Corporation of Puerto Rico, a wholly-owned subsidiary of Globe Aviation Services Corporation, is a corporation organized under the law of the State of Delaware, with its principal place of business in Springfield, Virginia.

13. For over twenty (20) years, Globe was one of the pre-eminent airport security companies providing security screening services in the United States and Puerto Rico. The vast majority of Globe's business consisted of pre-board security screening services. As a result, the Act had an especially devastating impact on Globe's business.

14. Defendant is the United States of America acting through, among other agencies, the TSA, which is now part of the Department of Homeland Security.

**JURISDICTION**

15. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1491(a)(1). Globe's claims against the United States are founded upon Section 101(g) of the Act and the Takings Clause of the Fifth Amendment of the United States Constitution.

## FACTUAL BACKGROUND

### *A. The Federalization of Aviation Security*

16. On November 19, 2001, the President of the United States signed the Act into law. A copy of the Act is attached hereto as Exhibit A. The Act created a new agency within the Department of Transportation known as the TSA, which is headed by an Under Secretary of Transportation for Security. See 49 U.S.C. § 144(a)-(b). On March 1, 2003, the TSA became part of the Department of Homeland Security's Division of Border and Transportation Security. The TSA's mission is to ensure the safety of all modes of domestic transportation, including aviation, railways, highways, and waterways. See 49 U.S.C. § 144(d).

17. Although the TSA is charged with protecting all forms of transportation, its primary responsibility is to assume control of aviation security at commercial airports. The Act required, among other things, that the TSA hire federal employees to perform passenger and baggage screening, install explosive-detection systems to screen all checked bags for explosive devices, and increase the number of plain clothed sky marshals traveling on domestic flights.

18. The Act sets forth a staggered schedule of deadlines by which the TSA had to take responsibility for various aspects of airport security. The Act required that three months following the enactment of the statute TSA assume civil aviation security functions and responsibilities. TSA did so by executing interim contracts with Globe and other airport security companies to replace their existing contracts with their airline clients. See Pub. L. No. 107-71, 115 Stat. 597, § 101(g)(1). By November 19, 2002, the TSA had to have a sufficient number of federalized screeners in place to screen all passengers at each of the 429 commercial airports in the United States and Puerto Rico. See id. at § 110(c)(1). By December 31, 2002, all checked baggage had to be screened by the TSA, although Congress subsequently authorized the Under

Secretary to extend that deadline. See 49 U.S.C. § 44901(d), as amended by The Homeland Security Act of 2002, Pub. L. No. 107-296 (2002).

*B. Airport Security in the United States and Puerto Rico Prior to the Act*

19. The Act, and specifically the decision to replace the private screening personnel with government employees represented a departure from the way airport security had been conducted in the past. The federal government previously had never deployed passenger and baggage screening personnel. Prior to the takeover of passenger screening by TSA, the airlines fulfilled the required security functions relative to passenger screening by entering into contracts with private companies that specialized in airport security. Under those contracts, the private security companies screened all passengers and carry-on baggage boarding commercial aircrafts, operating pursuant to mandates and regulations of the federal government.

20. The specific requirements and procedures for airline and airport security were set forth in the implementing statutes for the Department of Transportation, granting the Federal Aviation Administration ("FAA") the ultimate responsibility to promulgate regulations to ensure air travel safety. See 49 U.S.C. § 449; 14 C.F.R. §§ 107, 108. FAA regulations mandated screening of all passengers and property being carried on board an aircraft, and required each airport operator to establish a specific air transportation security program that addressed the safety of airline passengers. The FAA also issued agency guidelines, as well as other directions regarding what property was allowed on-board commercial flights.

*C. Globe's Presence In the Industry Prior to the Act*

21. For over twenty (20) years, Globe had provided security services at airports throughout the United States and Puerto Rico. Over the years, Globe had become one of the largest providers in the industry.

22. By 2001, when the Act was signed into law, Globe had contracts with six major airlines, TWA, United, USAir, American, Delta, and Northwest, to provide security screening services at over fifty (50) airports across the United States and Puerto Rico. Globe's relationship was governed by an individual basic agreement with each carrier, and addendums to each agreement were executed for each separate airport location at which Globe conducted screening operations for that airline. In addition to the contracts with the major airlines, Globe also had a number of contracts with smaller air carriers.

23. Globe had a significant presence at many of the largest and busiest airports in the country, including Los Angeles International, Logan International, and Minneapolis International.

24. The terms of Globe's contracts with the air carriers varied, but the airlines often renewed the agreements automatically for multiple consecutive terms. Consequently, several of Globe's airport security contracts had been in effect for more than fifteen (15) years when the Act was passed. For example, Globe had been providing security screening services for USAir and Delta since the mid-1980s, and for American Airlines since the mid-1990s. Indeed, Globe's contractual relationships with the airlines were so stable that an individual offered to purchase the Company in May 2001 at a substantial price.

25. In Globe's experience with the air carriers, on only rare occasions did an air carrier terminate a screening contract before the conclusion of the minimum term. Given this history, Globe reasonably expected that its contracts with each airline would continue. It therefore invested substantial effort and activity to grow its business and expand its team of security screeners.

26. As the Company grew, Globe invested significant resources and time to recruit, train, and supervise a large staff of airport security personnel. Globe's hiring process for its screeners was thorough and included criminal background checks, detailed applications and drug testing.

27. Indeed, when the TSA decided to terminate its relationship with Argenbright Security, Inc., another private screening company, subsequent to the September 11th attacks, the government entered into contracts with Globe when it needed to quickly staff airport security checkpoints vacated by the other company. The FAA contracted with Globe in April 2002 to add twelve (12) sites which were previously serviced by Argenbright. Globe stepped in and managed those new sites, expending further resources in taking over those additional airport checkpoints. As a result of these expanded operations and the increase in personnel at existing sites due to new security requirements, Globe's workforce grew to over 11,000 people by July 2002.

28. The Act – which gave birth to a government aviation security workforce – represented an unprecedented departure from the system that was previously in place. With the exception of an extremely limited pilot program, all airport screening security in the United States and Puerto Rico is now conducted directly by TSA through federal employees, pursuant to the requirements of the Act. As a direct result of this governmental takeover, Globe has been forced out of its airport security checkpoint screening business that it had operated successfully for more than 20 years, and losing all of its expected revenue stream from this business, as well as its going concern value and goodwill.

***D. The Act Provides for "Adequate Compensation"***

29. As initially introduced in Congress, the Act did not provide for any form of compensation to private security companies for the loss of business they would incur as a result of the

federalization of airport security. See S. 1447, 107th Cong. (2001) (as introduced on Sept. 21, 2001 in the Senate). Prior to enactment, however, the statute was amended, and the final version addressed the losses that inevitably would be inflicted on private security companies by the federalization of their functions and contracts. See H.R. Conf. Rep. No. 107-296, § 101(g), at 8 (2001), reprinted in 2002 U.S.C.C.A.N. 589, 589.

30. In a section entitled "Assumption of Contracts," the Act authorized the Under Secretary of the TSA to "assume the rights and responsibilities of an air carrier or foreign air carrier contract for provision of passenger screening services at airports in the United States … subject to payment of adequate compensation to parties to the contract, if any." Pub. L. No. 107-71, 115 Stat. 597, § 101(g)(2) (emphasis added). The Joint Explanatory Statement of the Conference Committee explained that the final version of the bill "require[d] the DOT to assume existing screening company contracts, as soon as possible, but not later than 90 days after enactment [of the Act]." H.R. Conf. Rep. No. 107-296, at 64 (2001), reprinted in 2002 U.S.C.C.A.N. 589, 601.

### *E. The Government Enters Into Interim Contracts with Globe and Other Private Security Companies*

31. The government effectuated Letter Contract No. DTFA01-02-C-04012 to Globe on February 17, 2002, to perform screening services at various airport locations throughout the country at which it previously had conducted screening services for its airline clients. Under this interim contract, Globe provided airport security services, on behalf of the TSA, during the transition period until the TSA was ready to assume full control of security screening on a site-by-site basis. The government has repeatedly acknowledged that it assumed the screening contractors' businesses.

32. In one instance, the then Under Secretary of Transportation for Security, testified before the Aviation Subcommittee, Committee on Transportation and Infrastructure that "[o]n February

17, less than a month from today, the TSA will take over the aviation screening responsibility that has been the airlines' up until now by assuming the airlines screening contracts and equipment that provide passenger screening at the Nation's airports."[2] A copy of this statement is hereby attached as Exhibit B.

33. In a second instance, the TSA reported to Congress that it "assumed the airlines' passenger screening company contracts and all equipment used to perform passenger screening at the Nation's airports."[3] A copy of the Report is hereby attached as Exhibit C.

34. While the interim contracts with Globe were in force, the TSA recruited and trained its own airport security screening workforce. When the TSA was prepared to take over and replace the private security screening workforce with its own employees on a site-by-site basis, it terminated the interim contracts with Globe at that site. Over a period of weeks, TSA gradually, but completely assumed all of Globe's functions at all airports and thereby assumed all its contracts with the airlines and took over the entire security screening business. Globe transferred its last site to federal control on December 31, 2002.

[2] *Implementation of the Aviation and Transportation Security Act with a Focus on the 60-day Deadline for Screening and Checked Baggage, Before the House Aviation Subcommittee, Committee on Transportation and Infrastructure*, 107th Cong. 3 (Jan. 23, 2002) (statement of then Under Secretary of Transportation for Security).

[3] U.S. TRANSPORTATION SECURITY ADMINISTRATION, REPORT TO CONGRESS ON TRANSPORTATION SECURITY 10 (Mar. 31, 2003).

### *F. Globe Is Entitled to Just Compensation Under The Fifth Amendment's Takings Clause*

35. The Fifth Amendment of the Constitution provides that private property shall not be taken by the federal government for public use "without just compensation." Where a taking is found to have occurred, the government must pay the owner the sum of money necessary to restore it to the same position as it would have occupied if its property had not been taken.

36. The Takings Clause is intended to prohibit the federal government from forcing a limited number of persons or businesses to bear public burdens which should, in all fairness, be borne by society in general. In this case, the nature of the government's federalization of a private sector function, the economic impact of the Act, and the disruption of Globe's settled financial expectations, all lead to the inescapable conclusion that a compensable taking has occurred.

37. Prior to the passage of the Act, Globe screened a significant percentage of all passengers traveling through airport security checkpoints in the United States and Puerto Rico. Unexpectedly and without warning, the Act appropriated that business by federalizing all of the passenger and baggage screening previously performed by Globe. Six years ago, no one could have anticipated that the United States government would replace the private screening workforce with government personnel. The government and the air carriers always looked to private companies, such as Globe, to perform security screening. Given that backdrop, Globe had a reasonable expectation that, as long as it continued to provide the appropriate level of screening services required by its clients, it would be able to continue providing airport security screening services in commercial airports across the United States and in Puerto Rico for the foreseeable future, thereby allowing it to recoup the substantial capital it had invested in its workforce and infrastructure.

### G. *The Losses Incurred By Globe as a Result of the Government's Actions*

38. As a direct result of the government's decision to federalize airport security, Globe has lost the going-concern and goodwill value of its entire airport security screening business. As set forth below, these losses include the destruction of both tangible and intangible assets.

39. The financial ramifications to Globe are numerous and significant. Among other things, Globe has experienced the following losses:

- every contract that Globe had with the various airlines to provide security checkpoint screening services has been lost;
- Globe's revenue stream from airport security screening services has been lost entirely;
- the going-concern value of Globe's screening business has been destroyed;
- the goodwill associated with Globe's screening business has been taken; and
- Globe had to lay off virtually its entire workforce of well-trained, experienced passenger and baggage screeners, in which it had invested substantial time and resources in recruitment, training, and supervision.

40. In addition to the loss in value of its security screening business that Globe suffered, the government benefited in numerous ways when it took over Globe's existing screening operations, at Globe's expense. For example, Globe's workforce of thousands of screeners was comprised of well-trained security personnel, many of whom had years of experience in airline security. The government actively recruited many of these employees for its own workforce. Faced with an uncertain future at Globe, in part because it was unclear how long Globe could continue to employ them before it was forced out of the business by the federalization mandated by the statute, many of Globe's long-time employees sought jobs with the TSA or left the industry altogether.

41. As a result of the government's taking of Globe's screening business, the Company is entitled to just compensation in an amount to be determined.

**COUNT I**
**(For Violation of the Aviation and Transportation Security Act)**

42. Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth herein.

43. By failing to pay "adequate compensation" to Globe for the loss of its contracts with the airlines to provide airport security services, the TSA has violated Section 101(g) of the Act. Globe is entitled to the fair market value of those contracts. Globe also is entitled to compensation for the delay in payment from the time of the loss of the contracts. The government is therefore required to pay just compensation to Globe in an amount to be determined.

**COUNT II**
**(For Violation of the Takings Clause of the Fifth Amendment to the United States Constitution)**

44. Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth herein.

45. By federalizing airport security at each airport where Globe had a contract with an airline client, and the resulting actions of the TSA, the federal government has taken the goodwill and going-concern value of Globe's security screening business for public use without providing just compensation, in violation of the Fifth Amendment of the United States Constitution. Globe is entitled to the value of the property taken. Globe also is entitled to compensation for the delay in payment from the time of the taking. The government is therefore required by the Fifth Amendment to pay just compensation to Globe in an amount to be determined.

**DEMAND FOR JUDGMENT**

WHEREFORE, plaintiffs pray that:

(1) Judgment be entered in favor of plaintiffs in a just amount to be determined, plus interest and costs; and

(2) Plaintiffs be awarded such other relief as the Court deems just and proper.

Dated: July 3, 2007

Respectfully submitted,

John J. Pavlick, Jr.
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

Of Counsel:
Paul A. Debolt
Dismas N. Locaria
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

DC1-205315-V.5

# INDEX TO EXHIBITS

**Exhibit** **Page**

Exhibit A – The Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 ........1

Exhibit B – Statement of John Magaw, Under Secretary of Transportation for Security, before the Aviation Subcommittee, Committee on Transportation and Infrastructure (January 23, 2002)........52

Exhibit C – Transportation Security Administration Report to Congress on Transportation Security (March 31, 2003)........56